IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GINA CRYSTAL HAWS,<br><br>Plaintiff,<br><br>v.<br><br>DRAPER CITY; DRAPER CITY POLICE DEPARTMENT; and CHAD CARPENTER,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING DRAPER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:20-cv-00091-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

Before the court is a motion for summary judgment filed by the Draper City Police Department ("the Department") and Draper City (collectively, "the Draper Defendants") against Gina Crystal Haws ("Haws" and "Plaintiff"). ECF No. 40. This case arises from Chad Carpenter's ("Carpenter") alleged sexual assault of Haws, his colleague in the Department. Haws seeks to hold Carpenter liable for this assault, but also sued the Draper Defendants under Title VII, 42 U.S.C. § 1983, and the Family Medical Leave Act ("FMLA") on the theory that they failed to prevent and adequately respond to Carpenter's harassment. After considering the parties' written submissions and arguments during the hearing on this motion, the court GRANTS the Draper Defendant's motion for summary judgment.

## FACTUAL BACKGROUND

Haws was hired as a Patrol Officer for the Draper City Police Department in April 2015. She served in this role for two and a half years. During her time as a Patrol Officer, Haws worked alongside Carpenter, a Sergeant, in several capacities. First, Carpenter and Haws participated in the Department's Explorer Program by providing teenagers a policing-oriented education for a

"couple hours [per] month." ECF No. 40-1, Ex. 1 at 29:25–30:5. When she was eventually promoted to Detective, Haws gave up this responsibility. Plaintiff also initially reported to Carpenter during special events more than five times a year. Carpenter was in charge of the security details for special events in Draper and set hours for Plaintiff and other officers on these occasions. Once Plaintiff was promoted out of the patrol unit, she stopped regularly serving on the special events security detail. But even after her promotion she still worked three events under Carpenter each year: the Draper Days Parade, the Draper Days Rodeo, and a road running race.

In late 2018, the Department elevated Carpenter from Sergeant to Lieutenant and he began overseeing the patrol unit. As a Lieutenant, he was one of the most senior employees in the Department. By this time, Haws had also taken on new responsibilities by transferring from the patrol unit to the sex crimes division of the detective unit. As a member of this unit, she reported to Pat Evans ("Evans"), Dave Harris ("Harris"), and Clint Fackrell. These supervisors conducted all of Plaintiff's performance reviews during her time in the detective unit. Their evaluations alone set Haws' rate of pay and determined her employment status.

At around the time Haws started work in her new role as a Detective, she formed an exercise group with Carpenter and another officer. All three officers were "out of shape" and wanted to "motivate each other." *Id.*, Ex. 1 at 59:1–60:14. The third officer in the group quickly stopped attending work out sessions, but Plaintiff and Carpenter continued to go on runs "on and off" for the next six months. *Id.* Plaintiff began to see Carpenter as a "[a] good friend. A work friend." *Id.* at 67:19–22. She texted with him about going on runs, work, and how she was faring after a recent series of breast surgeries. *Id.* at 69:6–20. Carpenter knew about Haws' procedures because she occasionally cancelled work out sessions due to ongoing recovery pain. *Id.* at 70:8–15, 127:3–12.

On January 31, 2019, during a period when Haws was still recovering from her surgeries, Plaintiff arrived at work and almost immediately encountered Carpenter. He asked Plaintiff "How you doin'?" *Id*. at 132:13. She replied "Good." *Id*. at 132:14. He then "motioned with his hands" to his chest area and asked, "Is everything okay?" *Id*. at 132:15-16. She said "Yeah," *Id*. at 132:17. Carpenter responded, "Well, come here. I haven't talked to you forever." *Id*. at 132:18-19. Plaintiff walked over to Carpenter's office, entered, and the two started engaging in "chitchat." *Id*. at 133:14-15. After a little while, Carpenter said, "Well, I want to see," and advanced around his desk towards his co-worker. *Id*. at 133:16-17. Once he was face to face with her, he grabbed the bottom of Haws' shirt and simultaneously motioned for her to shut the door. She reached over and pulled the door shut. Once it was closed, Carpenter lifted up her shirt, unzipped her sports bra, and squeezed both of her breasts three times. Haws quickly covered herself and began to cry. Carpenter asked her why she was crying, and she replied "I -- I just -- I -- I've been through a lot." *Id*. at 134:8-9. Plaintiff then exited Carpenter's office and went upstairs to her desk.[1] She was "shocked" by the incident and later stated that she never expected that it could have happened to her. *Id*. at 134:16-22. Haws did not interact with Carpenter again until a few weeks later when he found her at her desk, asked how she was doing, and stated, "You know that I love you; right?" *Id*. at 136:2–137:11. Carpenter further told Haws, "You know, if you need anything, you can let me know; right? . . . We have a special relationship." *Id*. at 136:23-25.

On March 13, 2019, roughly a month and a half after Carpenter inappropriately touched her, Haws joined a morning meeting with several officers. At this meeting, Lieutenant Evans realized that Haws "was not doing well" and mouthed the question "[a]re you okay?" in her

---

[1] Carpenter disputes the fact that he assaulted Haws, but the Draper Defendants do not. *See* ECF No. 14. For the purposes of this motion, the court assumes that Carpenter committed the assault and accepts the surrounding fact pattern as true.

direction. *Id.* at 142:17–143:6. Haws began to cry and said "no." Evans and Sergeant Harris, who was also in attendance, dismissed all the officers apart from Haws. At these supervisors' request, Haws then described her assault by Carpenter. This was the first time that Plaintiff had shared the facts of the incident with anyone linked to Draper City. After Haws informed them of the situation, Harris and Evans began taking steps to open an investigation into Carpenter. They took Plaintiff's computer and phone for the investigation, told her she could go home, and requested that she report the incident to Hazel Dunsmore ("Dunsmore"), who was an employee in Draper City's human resources department. Evans also assured Haws that he believed that her story was true. Plaintiff later stated that while she was reporting the incident, she was terrified that her decision would ruin her career and friendships in the Department.

After sharing her story with her supervisors, Plaintiff promptly reported Carpenter to Dunsmore. Upon listening to Haws' story, Dunsmore informed Plaintiff that she was friends with Carpenter and that she would have to recuse herself from the investigation. Consequently, Dunsmore contacted Draper City's outside counsel to start a third-party investigation. Outside counsel quickly appointed Libby Lowther ("Lowther") to investigate the complaint. Within hours Lowther visited Plaintiff's house to conduct an interview. Lowther never completed her investigation, however, because Carpenter resigned the day she asked to interview him about the incident. Prior to his resignation, Carpenter had been placed on administrative leave. Soon after Carpenter's resignation, Lowther closed her investigation without issuing conclusive findings. She cited her inability to obtain a statement from Carpenter as her main reason for completing the inquiry early.

Following Carpenter's resignation, Plaintiff asked to be reassigned from her position as a sex crimes detective. Understandably, she did not feel she was able to perform her duties in this

unit without a serious toll on her mental health. In April 2019, Haws met with Evans and Chief John Eining ("Eining") to discuss this move. Eining offered Plaintiff a position in either the Department's property crimes unit or patrol unit. He also gave her the option to quit if she did not wish to transfer to either role. Haws ultimately chose to be reassigned to property crimes.

At this same meeting, Plaintiff also requested paid sick leave to help recuperate from her traumatic encounter with Carpenter. After her assault, Plaintiff had started seeing a therapist with the goal of managing the mental health repercussions of the incident. This therapist eventually sent a letter to Evans and Eining recommending that Plaintiff "be given paid time off to relieve stress caused by the incident in January." *See* ECF No. 40-1, Ex 18. When pushed for paid sick leave at the April meeting, Eining denied the request, citing the fact that Plaintiff had already exhausted her paid sick leave for the year by taking time off to recover from her surgeries. But Eining did not state that Plaintiff could not take FMLA leave. Draper City's FMLA policy required that employees exhaust all paid sick leave before taking unpaid FMLA leave. Under the policy, employees were eligible for up to twelve weeks of unpaid FMLA leave for "specified family and medical reasons." *Id*., Ex. 13. To take FMLA leave, employees needed to send requests "to human resources and [to] notify supervisors in writing." *Id*. After Eining denied Plaintiff paid sick leave, she did not submit any additional request for leave, FMLA or paid, to anyone in City government. Plaintiff was familiar with the department's FMLA policies because she had previously submitted FMLA leave requests to Dunsmore for human resources approval when she took time off for her surgeries in 2018.[2] She had also signed at least one acknowledgement of the City's FMLA leave policy in 2018.

---

[2] Plaintiff exhausted her paid sick leave in 2018 and began using FMLA leave to cover her absences due to surgery recovery. Still, she received her salary when she was on unpaid FMLA leave because co-workers donated their paid sick leave to support her.

Draper City maintained a "Harassment-Free Workplace Policy" ("Harassment Policy") during the events of this case. The policy stated that if an employee believed that they had been unlawfully harassed, or had witnessed unlawful harassment, they were "strongly encouraged to immediately bring it to the attention of the appropriate supervisor, department director, human resources director, city attorney, or city manager." *Id.*, Ex. 7. The City also trained its police officers on the details of the Harassment Policy annually. Both Plaintiff and Carpenter received two days of sexual harassment education in 2018. This included a 31-page Power Point presentation, definitions of what constitutes unlawful harassment, and explanations of the reporting requirements for harassment. At the end of the training session, Plaintiff and Carpenter were both required to pass a true/false test and sign a document affirming that they understood how to report workplace harassment.

Prior to Plaintiff's assault, the Draper Defendants had already investigated Carpenter for a past violation of the Harassment Policy. In 2012, a co-worker complained, through Draper's human resources department, that Carpenter and another officer had commented on a female officer's "too small t-shirt." *Id.*, Ex. 11. After an investigation of this claim, Carpenter was disciplined.[3] In 2013, after the same co-worker was terminated for driving her patrol vehicle intoxicated, she filed a charge of discrimination with the Utah Anti-discrimination and Labor Division ("UALD") and the Equal Employment Opportunity Commission ("EEOC"). These charges alleged that an unnamed supervisor had "groped [her] breasts" between 2009 and 2013. *Id.* Carpenter was one of the complainant's supervisors at the time of the assaults in question. After an investigation, the Draper Defendants found that they could not identify which officer had

---

[3] Although the parties did not submit any evidence explaining how Carpenter was disciplined, the confidential results of the 2013 harassment investigation described below state that the reporting individual "did not express dissatisfaction with the results of [the 2012] complaint." *Id.*

groped the complainant and concluded that they were "unable to substantiate or corroborate [the officer's] claim of harassment . . . ." *Id*.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANAYLSIS

### I.    § 1983 CLAIM

In her complaint, Plaintiff advanced a claim under 42 U.S.C. § 1983 alleging that the Draper Defendants deprived her of her constitutional rights. The Draper Defendants moved for summary judgment on this cause of action on grounds that they did not enact policies or adopt customs resulting in a violation of Plaintiff's constitutional rights. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1989) (holding that a municipality cannot be held liable for § 1983 injuries inflicted solely by its employees unless a government policy or custom caused the injuries.). Plaintiff did not respond to this argument or even mention her § 1983 claim in her opposition memorandum.

According to DUCivR 56-1(f), "[w]hen a party fails to timely respond, the court may grant the motion without further notice if the moving party has established that it is entitled to judgment

as a matter of law." Here, Defendants have established that they are entitled to judgment as a matter of law because Haws failed to present any evidence that the Draper Defendants enacted policies or adopted customs that deprived her of a constitutional right. Thus, the court exercises its discretion to grant Defendants' motion for summary judgment on this claim.

## II.    FMLA CLAIM

Plaintiff argues that the Draper Defendants violated the FMLA by interfering with her access to leave to which she was entitled under the Act ("FMLA leave"). 29 U.S.C. § 2615(a)(1). A successful FMLA interference claim requires "a showing of FMLA leave entitlement, a denial of substantive rights under the FMLA, and a causal connection between the two." *Dry v. The Boeing Co.*, 92 F. App'x 675 (10th Cir. 2004) (citing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002)). While the parties do not dispute that Plaintiff was entitled to FMLA leave, Plaintiff fails to produce any evidence that the Draper Defendants denied her access to this type of leave.

In April 2019, Plaintiff met with Evans and Eining to discuss taking paid sick leave to recover from stress resulting from her assault. Haws' request came at the recommendation of her therapist, Michelle Dye, who believed that she needed an unspecified amount of time to "regain her focus and composure." ECF No. 40-1, Ex. 18. Eining denied Plaintiff's request for paid sick leave at the April meeting, but never stated that he would not approve a request for FMLA leave. Eining's justification for denying Haws' request for paid sick leave was the fact that she had already used all of the *paid* sick leave she was entitled to under Department policy while recovering from prior surgeries. During her recuperation, Plaintiff had also used some FMLA leave, but not all of the twelve weeks of leave to which she was entitled under the City's FMLA policy. ECF No. 40-1, Ex. 13. After Eining declined to provide Haws additional paid sick leave, Plaintiff never followed up with a request for FMLA leave or any other form of leave. Because Haws never put

the Draper Defendants on notice that she desired FMLA leave, this court is initially inclined to conclude that the Draper Defendants never had the opportunity to deny her access to FMLA leave.

But Plaintiff argues that even if she never requested FMLA leave, Defendants still interfered with her entitlement to unpaid time off by failing to notify her of her right to take FMLA leave once she was denied paid sick leave. After reviewing the relevant case law, the court is unpersuaded by this argument. In the Tenth Circuit, "[i]f the employer is on notice that the employee might qualify for FMLA benefits, the employer has a duty to notify the employee that FMLA coverage may apply." *Tate v. Farmland Industries, Inc.*, 268 F.3d 989, 997 (10th Cir. 2001). Nevertheless, a request for paid sick leave does not trigger this requirement when a plaintiff "already requested and received FMLA leave multiple times during her tenure" with her employer. *Branham v. Delta Airlines*, 678 F. App'x 702, 706 (10th Cir. 2017). This exception to the rule is based on regulations interpreting the FMLA that state, "When an employee seeks leave *for the first time* for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b) (emphasis added).

Here, Defendants' conduct falls within the exception to *Tate*. Plaintiff had requested FMLA leave in September 2018, mere months before her request for paid leave in April 2019. Draper's leave request form, which Plaintiff signed, clearly detailed her FMLA entitlements, including the fact that she was entitled to up to twelve weeks of unpaid leave per year. ECF No. 40-1, Ex. 14. While Plaintiff made only one request for FMLA leave,[4] unlike in *Branham*, Plaintiff requested roughly a month and a half of this variety of leave; meaning that her request could not

---

[4] Defendants represented at hearing that Plaintiff made multiple FMLA leave requests prior to the incident. The court need not determine whether Haws made one request or many for the reasons outlined below.

have been confused with less substantial forms of sick leave.[5] *Id.*; *see* 678 F. App'x at 706. Additionally, when Haws signed her request for FMLA leave in September 2018, she attested to the fact that she had received a copy of the sections in the Draper City personnel manual pertaining to her FMLA rights. *Id.*, Ex. 13. Moreover, it is undisputed that Plaintiff knew how to make FMLA leave requests. Plaintiff admits in her briefing that she "understood that FMLA applications were to be made verbally to Hazel Dunsmore." ECF No. 48 at 29 (citation omitted). Clearly, Plaintiff was on notice that she was entitled to FMLA leave.

Haws nevertheless maintains that even though she had taken substantial recent FMLA leave and had been provided the FMLA policy, she still did not understand her rights and was entitled to additional notification from the Draper Defendants regarding her ability to use FMLA leave. When Haws took FMLA leave in September 2018, members of the Department had donated their own paid sick leave time so that she would be paid even though she had exhausted her paid sicks days. Plaintiff's attorney argues that, because she had sought and accepted sick leave donations from the Department in 2018, she did not realize that she could take unpaid FMLA leave without going through the donation process again. The court is unpersuaded by this argument. Nowhere in Plaintiff's deposition testimony does she express confusion about how FMLA leave works in the ways represented in her counsel's memorandum. Indeed, Haws correctly explained that she had run out of paid sick leave in 2018 and needed to rely on FMLA leave to take additional time off in 2019. ECF No. 40-1, Ex. 1 at 116:25–117:1. She also described how her entitlement to

---

[5] The regulations pertaining to the FMLA only require affirmative notice of leave entitlement to be given by an employer "the first time" an employee seeks leave for a qualifying reason. 29 C.F.R. § 825.303(b). Because of this, even though the Tenth Circuit's decision in *Branham* only granted an exception to *Tate* in a circumstance where the Plaintiff had sought FMLA leave multiple times, the language of the regulation makes clear that the exception also applies to the present dispute. *Branham*, 678 F. App'x at 706; *Tate*, 268 F.3d at 997.

pay during her FMLA absence depended on whether employees in her department donated leave in response to the City human resources department's requests for donations. *Id*. at 116:14–17. And finally, she admits that she understood there was a significant difference in the process for taking paid sick leave and FMLA leave. *See Id*. at 111:13–113:16 ("Q. So, when FMLA is not involved, you don't involve the city? A. Right. Q. When FMLA is involved, you have to involve the city? A. Right."). In short, Plaintiff's counsel is attempting to create a dispute over his client's alleged confusion where none exists. Because a reasonable jury could not find that the Draper Defendants interfered with Plaintiff's right to take FMLA leave, the court grants summary judgment as to Plaintiff's FMLA claim.

### III.    SEXUAL HARASSMENT CLAIM

Haws claims that although the Draper Defendants never directly harassed her, they are nevertheless liable for sexual harassment under Title VII because they failed to protect her from Carpenter. Under Title VII, employers may not "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). This provision clearly bars employers from discriminating in decisions that have direct economic consequences, such as termination, demotion, and pay cuts. But the Supreme Court has also held that Title VII "reaches the creation or perpetuation of a discriminatory work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 426 (2013).

An employer's Title VII liability for harassment on the basis of sex depends on the status of the harasser. "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions" *Id*. at 424. But if the harasser was the victim's supervisor, the victim's employer is strictly liable under the theory of vicarious liability when the

harassment "culminate[d] in a tangible employment action." *Id*. Haws contends that Carpenter was her supervisor and, thus, that the Draper Defendants are strictly liable for his actions.

"An employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id*. "Tangible employment actions" are those actions that entail "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 431. To qualify as a supervisor, an employee does not need to possess the authority to independently take a tangible employment action against a Plaintiff. Rather, a "manager who works closely with his or her subordinates and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII." *Kyser v. D.J.F. Servs., Inc.*, No. CIV-16-542-KEW, 2017 WL 5690889, at *2 (E.D. Okla. Nov. 27, 2017) (citing *Vance*, 570 U.S. at 447). According to the Supreme Court, "the question of supervisor status, when contested, can very often be resolved as a matter of law before trial." *Vance*, 750 U.S. at 443. In fact, the Court urges district courts to resolve this issue at summary judgment in order to "focus the efforts of the parties" and allow them "to present their cases in a way that conforms to the framework that the jury will apply." *Id*.

As an initial matter, the parties agree that Carpenter was not Haws' direct supervisor at the time of the assault. From 2018 until the date of his resignation, Carpenter oversaw the patrol unit as a Lieutenant. During this time, Plaintiff was a member of the detective unit—an entirely different section of the Department. Additionally, Plaintiff admits that Sergeant Harris was her immediate manager and Evans was her Lieutenant at the time of the assault. ECF No. 40-1, Ex. 2 at 3. Moreover, Carpenter confirmed these facts in a sworn interrogatory. *Id*., Ex. 3.

Though Haws did not report directly to Carpenter day-to-day, she still maintains that he was her supervisor for the purpose of Title VII because he had the power to tangibly change her employment status. Specifically, Haws argues that "as a superior and higher-ranking officer compared to the Plaintiff," Carpenter was able to "mandate the presence of officers, require additional duties not necessarily in line with their current positions, require overtime work, conduct mandatory trainings and require presence and participation thereat, and maintain control over equipment the other officers needed and used." ECF No. 48 at 23. It is not entirely clear from where Plaintiff derives this list of powers, but it appears that she is attempting to refer to Carpenter's management powers during special events, such as the festivities associated with Draper Days.

Haws' argument that Carpenter was a supervisor due to his special event duties is seriously flawed. For an employee to qualify as a supervisor under Title VII he or she must have the power to "effect a *significant* change in employment status." *Vance*, 750 U.S. at 431 (emphasis added). The list of actions that reach such a level include "hiring, firing, failing to promote, reassignment to significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. None of the powers Plaintiff claims Carpenter held could *significantly* impact Plaintiff's employment status and none align with those enumerated in *Vance*. *Id*. The only power Carpenter held that remotely approaches one of the powers listed in *Vance* is the ability to "require [officers to perform] additional duties not necessarily in line with their current positions." ECF No. 48 at 23. But this authority is limited by the specific scenarios in which Carpenter was able to wield it. Carpenter was only able to reassign Plaintiff to new duties during the three days a year she worked

special events under his command.[6] Three days of control over an employee's schedule and duties hardly entails a *significant* ability to change her employment status. Given the facts presented by the parties, no reasonable juror could conclude that Carpenter was Haws' supervisor at the time of her alleged assault.[7]

Even if Carpenter does not qualify as a supervisor for purposes of Title VII, Plaintiff can still establish Title VII liability by showing that the Draper Defendants negligently failed to protect Haws from Carpenter's assault. To find an employer liable for harassment under a negligence theory, the court "must make two inquiries: first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998). It is Haws' burden to show that the Draper Defendants "had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Prabhakar v. C.R. England, Inc*., 2013 WL 5408539, at *3 (D. Utah Sept. 25, 2013) (internal quotation marks omitted). "[T]he focus is not on whether the employer is liable for the bad acts of others, but whether the employer itself is responsible for failing to intervene." *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001).

---

[6] Plaintiff is not even confident that Carpenter oversaw security during special events at the time of her assault. She testifies that when Carpenter moved from Sergeant to Lieutenant, he may have given up this responsibility. ECF No. 40-1, Ex. 1 at 75:21-76:1.

[7] Plaintiff also seems to speculate that the very nature of Carpenter's job as a high-ranking official meant that he had the ability to recommend significant changes to Haws' employment status and that these recommendations carried significant weight with Department leadership. The court cannot accept this argument because Plaintiff produces no evidence to support it other than the evidence already examined pertaining to Carpenter's special event duties.

Haws contends that the Draper Defendants had constructive knowledge of Carpenter's harassment because he was a "dangerous employee whose tendencies the [Department] should have known about." *Kramer v. Wasatch Cnty. Sheriff's Off.*, 743 F.3d 726, 755 (10th Cir. 2014). A plaintiff generally may show that an employee was dangerous and that her employer should have known that harassment was ongoing by offering evidence of "sexual harassment by [the perpetrator] that is similar in nature and near in time to his sexual harassment of [the victim]." *Hirase-Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777, 784 (10th Cir. 1995). Here, there were warning signs that Carpenter had the potential to harass women in the Department. First, the parties agree that the Department had previously determined that Carpenter had sexually harassed a different female officer in 2012 by making comments about her "too small t-shirt." ECF No. 40-1, Ex. 11. Carpenter was punished for his role in this incident. Second, Plaintiff argues that a June 2013 complaint and investigation into harassment by an unnamed officer suggests that Carpenter may have also un-consensually touched the breasts of the same officer who made the 2012 complaint.[8] Both serious allegations certainly indicate that the Draper Defendants should have been wary of Carpenter's relationships with women in the Department.

But for a court to find that an employer had constructive notice of harassment, case law requires proof of more than just similar conduct directed at different victims remote in time. In *Kramer*, the court held that "[t]emporal proximity is crucial when considering whether knowledge of past bad acts creates constructive notice of later acts." 743 F.3d at 756. In the present case, at minimum, more than five years had passed between the latest potential date on which Carpenter

---

[8] Though the individual reporting this incident did not name Carpenter as her harasser and the resulting investigation into her complaint was inconclusive, the court assumes for the sake of this motion that the Department suspected Carpenter was responsible for the assault at issue. *Nash Oil & Gas*, 526 F.3d at 629.

could have assaulted the 2013 complainant and the date on which he assaulted Haws. In the ensuing years between the two incidents, there is no evidence that any individual complained about Carpenter's behavior towards women. Ultimately, this case is akin to *Ford v. West*, where the Tenth Circuit found that a defendant's knowledge of similar events from more than ten years prior did not create constructive notice. 222 F.3d 767, 776-77 (10th Cir. 2000) It is different than a case like *Hirase-Doi*, where the same court held that knowledge that an individual was harassing other women *during* the same time period as he was harassing a plaintiff created constructive notice.[9] 61 F.3d at 784. This court, therefore, holds that the Draper Defendants did not have constructive notice of Carpenter's harassment and that the Draper Defendants did not negligently violate Title VII.

In sum, Haws has failed to establish that the Draper Defendants are liable under Title VII either because Carpenter was Plaintiff's supervisor or because the Draper Defendants negligently allowed a dangerous employee to work alongside their female employees while they had constructive notice of ongoing harassment. The court, therefore, sees no need to examine whether Defendants are entitled to the *Ellerth/Faragher* affirmative defense. *See Helm v. Kansas*, 656 F.3d 1277, 1288 (10th Cir. 2011).

## IV.    RETALIATION CLAIM

Haws claims that the Draper Defendants violated Title VII by retaliating against her for reporting Carpenter. She argues that because of her decision, she was denied FMLA leave,

---

[9] Plaintiff also cites *Chapman v. Carmike Cinemas* for the proposition that, though the 2013 complaint and the assault at issue here are not temporally proximate, they are "so identical in nature that they more than qualify as sufficiently comparable to put the City on constructive notice." ECF No. 24 at 40 (citing 307 F. App'x 164 (10th Cir. 2009) (no pincite provided)). The court is perplexed by this argument because *Chapman* only held that an isolated incident of verbal harassment was not enough to put an employer on notice that the verbal abuser would sexually assault the Plaintiff. *Id*. at 171. The case does not even mention temporal proximity.

Lowther's investigation into the assault was never completed, and she was told that she had the option to quit. She also maintains that after reporting Carpenter, some officers gave her "the cold-shoulder treatment" and her applications to work for other police departments were all rejected. ECF No. 48 at 27.

To establish a prima facie case of retaliation under the *McDonnell Douglas* standard, a plaintiff "must present evidence of three things—that [s]he engaged in protected activity, that [s]he suffered an adverse employment action, and that a close causal link exists between the two." *Barrett v. Salt Lake Cty.*, 754 F.3d 864, 866-67 (10th Cir. 2014). If a plaintiff can establish a prima facie claim, the burden then shifts to her employer "to present proof that it took the adverse action against the plaintiff for a legitimate, non-retaliatory reason." *Id*. at 867. If the employer can satisfy this burden, "the ball returns to the plaintiff who must show the employer's stated reasons are pretextual." *Id*.

Here, there is no dispute that Plaintiff engaged in protected activity when she reported Carpenter, but question remains as to whether Plaintiff experienced harms that reached the level of an adverse employment action after she submitted her report to Dunsmore. Even if Plaintiff can establish a prima facie claim of retaliation, the Draper Defendants argue that their adverse employment actions against Plaintiff were justifiable. The court examines each alleged act of retaliation in turn.

## A. DENIAL OF FMLA LEAVE

Haws alleges that she was denied FMLA leave in retaliation for reporting Carpenter. The court finds that Plaintiff can establish a prima facie case of retaliation through this claim, however, the Draper Defendants had a legitimate and non-retaliatory reason for failing to grant Haws FMLA leave.

As previously discussed, to establish a prima facie claim, a plaintiff must show three things. First, she must show that she engaged in protected activity. Reporting Carpenter for sexual harassment is undeniably a protected activity. *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015-16 (10th Cir. 2004) (holding that to show a plaintiff engaged in protected activity, she must only show "a reasonable good-faith belief that" she was opposing discrimination). Second, she must show that she suffered an adverse employment action. In the Tenth Circuit, adverse employment actions are actions that a "reasonable employee" would find materially adverse. *See Bekkem v. Wilki*e, 915 F.3d 1258, 1267 (10th Cir. 2019). A materially adverse action is one "which might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Failing to grant a plaintiff's request for FMLA leave is undoubtedly an adverse employment action because a reasonable employee could easily decide to not report sexual harassment in order to avoid restricted access to FMLA leave.

Third, she must establish that a close causal relationship exists between her protected activity and the adverse employment action. To meet this requirement, a plaintiff may show that there was "temporal proximity between the protected activity and adverse action." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). Here, roughly a month passed between the time Plaintiff reported her assault in March and the moment her FMLA request was denied in April. In the Tenth Circuit, a one-and-a-half-month gap between protected activity and an adverse action is sufficient to establish causation. *Argo v. Blue Cross & Blue Shield, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). The court, thus, finds that Plaintiff can establish a prima facie case of discrimination.

The Draper Defendants respond by stating that they did not provide Plaintiff FMLA leave for a legitimate and non-retaliatory reason. They attempt to meet their *McDonnell Douglas* burden by arguing that Haws asked the Department only for paid sick leave—a form of leave that she had already exhausted. Because Haws never requested FMLA leave, the Draper Defendants could not have refused it as an act of retaliation. Plaintiff does not deny that she had exhausted her paid sick leave or that she did not ask for FMLA leave. Instead, she argues that she was constructively denied access to FMLA leave because the Draper Defendant failed to notify her that taking FMLA leave was an option. For the reasons discussed in this decision's FMLA leave denial section, the court is unpersuaded that Defendants had an obligation to inform Plaintiff that she could take FMLA leave. In short, Defendants' proffered justification for an adverse employment action satisfies its *McDonnell Douglas* burden to provide a legitimate and non-retaliatory reason that Plaintiff was not offered FMLA leave.

Haws can still overcome summary judgment if she can show that the Draper Defendants' reason for denying her FMLA leave request was pretextual. But Plaintiff makes no argument in her memorandum "revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [her] employer's proffered reason" for its adverse action. *Daimaru v. Wayfair, LLC*, No. 221CV00660JNPCMR, 2022 WL 4467453, at *8 (D. Utah Sept. 26, 2022). The closest Haws can come to showing pretext is pointing out the temporal proximity between her report of harassment and her denial of FMLA leave. But in the Tenth Circuit, while "close temporal proximity is a factor in showing pretext," it is not sufficient alone to defeat summary judgment. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000). Thus, the court finds that no reasonable jury could hold that Defendants retaliated against Plaintiff by denying her FMLA leave.

19

### B. DRAPER'S FAILURE TO COMPLETE ITS INTERNAL INVESTIGATION

Plaintiff argues that the Draper Defendants failed to complete their internal investigation into her assault in retaliation for her decision to report the incident to management. This, she maintains, left her "without any necessary closure or form of recompense" for her suffering. ECF No. 48 at 27. The court finds that Haws' claim fails at the prima facie stage because an employer's failure to conduct a thorough investigation cannot, on its own, give rise to a prima facie case of retaliation.

Courts across the country have routinely held that "the failure to conduct an adequate investigation . . . cannot be . . . considered an action that reasonably would deter an employee from engaging in the protected activity under Title VII." *Cozzi v. Cty. of Marin*, 787 F. Supp. 2d 1047, 1069 (N.D. Cal. 2011). Consequently "an inadequate investigation is not an adverse employment action under Title VII." *Brown v. Dignity Health*, No. CV-18-03418-PHX-JJT, 2020 WL 3403088, at *14 (D. Ariz. June 19, 2020) (citing *Taylor v. AFS Techs., Inc.*, No. CV-09-2567-PHX-DGC, 2011 WL 1237609, at *4, n.3 (D. Ariz. Apr. 4, 2011), *aff'd*, 503 F. App'x 531 (9th Cir. 2013)); *see also Revak v. Miller*, No. 7:18-cv-206-FL, 2020 WL 3036548, at *9 (E.D.N.C. June 5, 2020) (holding that a failure to remedy alleged sex-based harassment did not constitute an adverse employment action); *Clemmer v. Office of Chief Judge*, No. 06-3361, 2008 WL 5100859, at *15 (N.D. Ill. Dec. 2, 2008) (finding that a "[plaintiff] may have preferred her employer to do more in its investigation, but its failure to conduct an inquiry to her satisfaction does not constitute an adverse action."); *McFalls v. BrightView Landscapes*, LLC, 2020 WL 1922828, at *10 (E.D. Pa. Apr. 21, 2020) (holding that "allegedly inadequate investigation does not constitute an adverse employment action for purposes of the retaliation claim.").

While the Tenth Circuit has not directly addressed whether a defendant's failure to investigate qualifies as a materially adverse employment action, this court is persuaded that the

Draper Defendants' failure to investigate was not adverse to Haws' employment. It is true that Plaintiff may not have experienced closure because the investigation was never completed, but this failure never came close to threatening Plaintiff's working hours, salary, benefits, or job. In fact, even though the investigation did not formally make any finding of guilt, the investigation ended with Carpenter's resignation. This outcome was hardly detrimental to Haws. Ultimately, the court finds that a "reasonable employee" could not find that the decision to end the investigation of Carpenter's conduct upon his resignation was materially adverse to Plaintiff's employment. *Bekkem*, 915 F.3d at 1267.

### C. Eining's Suggestion to Quit

Plaintiff contends that the Draper Defendants retaliated against her by telling her that she had the option to quit the Department. No reasonable juror could find that this claim holds merit. After Haws was assaulted, she requested a transfer out of her job in the sex crimes unit because the unit's work, by its very nature, would inevitably trigger her post-traumatic stress disorder. Chief Eining agreed to transfer Plaintiff, but only if she agreed to move to the property crimes or patrol units. Eining also told Haws that she could quit the police force if she believed neither option would suffice. Ultimately, Plaintiff chose to move to the property crimes unit and made the switch in March 2019. This transfer was only temporary. At Plaintiff's request, the Department transferred her back to the sex crimes unit prior to November 2020. ECF No. 40-1 at 187:20-188:16. Plaintiff does not allege that her pay was reduced or that her career was harmed in any way when she was moved to the property crimes unit. Nor does she suggest that she viewed working in property crimes as a demotion. On the contrary, it seems as though Haws asked for reasonable accommodations after a traumatizing event and the Department did what it could to meet her needs. In light of these facts, no reasonable jury could find that the Department's handling of Plaintiff's transfer request qualifies as an adverse employment action.

### D. "COLD-SHOULDER TREATMENT"

Haws claims the Draper Defendants are liable for retaliation because "she has been treated differently by other officers; some officers, employees of the City, wouldn't speak to her directly; many won't work with her individually; [and] she has been told that she 'destroyed' Carpenter's career." ECF No. 48 at 27. Haws also contends that the Department's "cold-shoulder treatment was egregious enough that she filed a separate report of retaliation." *Id*.

This particular basis for establishing a prima facie case of retaliation fails from the outset. It is well established in the Tenth Circuit that the "cold shoulder" treatment and "shunning" does not constitute adverse employment action as a matter of law. *See Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010). "Title VII protects individuals not from all retaliation but only from retaliation that produces an injury or harm" that itself rises to a "level of seriousness." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007) (quotation marks omitted). "Requiring this level of adversity . . . is necessary to separate significant from trivial harms." *Id*. (quotation marks omitted). "Petty slights, minor annoyances, and simple lack of good manners," cannot form the basis of a retaliation case. *Burlington*, 548 U.S. at 68. In applying this standard, the Tenth Circuit has held that "shunning by co-workers [is] not actionable retaliation" and that the "'silent treatment' is mere passive treatment that does not constitute an adverse employment action." *Johnson*, 594 F.3d at 1216 (Cleaned up). Assuming the truthfulness of Plaintiff's factual assertions regarding her treatment by other employees, this case still does not rise to the level of seriousness required by *Johnson* because the allegedly cruel actions of Plaintiff's co-workers are insufficient to establish a prima facie case of retaliation.

### E. FAILURE TO FIND ALTERNATIVE EMPLOYMENT

Finally, Plaintiff claims that the Draper Defendants are liable for retaliation because she "has applied for positions with other police departments, but has been indirectly informed that no

other department will hire her while she is in litigation with the City." ECF No. 48 at 27-28. Haws does not specifically allege that the Defendants have contributed in any way to her failure to obtain a job in a different police department. Nor does she present any facts showing that this is the case. Regardless, Haws still maintains that other departments' failure to hire her constitutes retaliation by the Draper Defendants. This theory fails as a matter of law. A plaintiff cannot establish a prima facie claim of retaliation when she does not allege that the defendant has caused this outcome. *Barrett*, 754 F.3d at 867 (specifying that the defendant against which the plaintiff was attempting to claim damages must have taken an adverse employment action).

Haws fails to show that a reasonable jury could find the Draper Defendants liable for retaliation under Title VII. Therefore, the court must grant Defendants' motion for summary judgment regarding this cause of action.

## CONCLUSION & ORDER

For the aforementioned reasons, the court GRANTS the Draper Defendants' motion for summary judgment.

DATED March 22, 2023

BY THE COURT

_____

Jill N. Parrish
United States District Court Judge